# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

VITA FOOD PRODUCTS, INC.,     )
                                     )
          Plaintiff,         )
                                     )     No. 16 C 08210
       v.                 )     Hon. Marvin E. Aspen
                                     )
NAVIGATORS INSURANCE     )
COMPANY,                    )
                                     )
          Defendant.      )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Vita Food Products, Inc. ("Vita") filed this declaratory judgment action to adjudicate the rights and obligations of the parties with respect to Vita's demand for defense and indemnity under two insurance policies Defendant Navigators Insurance Company ("Navigators") issued to Vita. Presently before us is Navigators' motion for judgment on the pleadings. (Dkt. No. 22.) Also before us is Vita's motion to strike Navigators' affirmative defenses. (Dkt. No. 19.) For the reasons stated below, both motions are granted in part and denied in part.

## BACKGROUND

On October 2, 2009, two dozen of Vita's former shareholders filed a complaint asserting claims against six of Vita's directors (the "underlying lawsuit"). (Compl. ¶ 6; *see also* Underlying Compl. (Dkt No. 1–1).) The plaintiff-shareholders in the underlying lawsuit asserted federal racketeering claims, as well as state-law breach of fiduciary duty and negligence claims arising out of a 2009 merger under which Vita's outstanding shares were sold to one of the

underlying defendants, Howard Bedford, for an allegedly inadequate price.  (Compl. ¶ 7.)  The

underlying complaint alleged that Bedford, one of Vita's directors, engaged in a "fraudulent

scheme to steal the business and assets of a profitable company, VITA . . ., by paying

substantially less for that business and those assets than their true value."  (Underlying

Compl. ¶ 1.)  The underlying lawsuit claimed "[t]hrough fraud, deceit, breaches of fiduciary

duties, self-dealing, and other acts," Bedford and five other Vita directors formed an enterprise

"to steal the business and assets of VITA through engaging in a pattern of racketeering."

(*Id.* ¶ 3.)  The alleged "integral ingredients of Bedford's scheme" included (1) taking effective

control of Vita through an additional contribution to its capital; (2) replacing members of the

Board of Directors of VITA with individuals who would participate in carrying out the corrupt

enterprise; (3) issuing public financial reports, which contrary to internal reports, would show

VITA to be experiencing continuing, long-term difficulties; (4) arranging to merge VITA into a

corporation, all of the stock of which would be wholly owned, directly or indirectly, by Bedford;

(5) carrying out an elaborate process which would fraudulently make it appear that the terms of

the merger were fair to VITA; (6) completing the merger of VITA into the Bedford corporation.

(*Id.* ¶ 34.)

Shortly after the defendants were served with the underlying lawsuit, Vita demanded that

Navigators provide coverage under a "claims made" Directors and Officers Liability Insurance

Policy Navigators issued to Vita, as amended, for the policy period January 17, 2009 to

April 23, 2014 (the "2009 Policy").  (Compl. ¶¶ 11, 15; 2009 Policy, Compl., Ex. C

(Dkt. No. 1–3).)  By letter dated October 26, 2009, Navigators denied coverage.  (Compl. ¶ 16;

*see also* Denial Letter, Compl., Ex. D (Dkt. No. 1–4).)  Specifically, Navigators stated that

pursuant to Section IV.B, the 2009 Policy did not apply. (Compl. ¶¶ 16–17.) Section IV.B of

the 2009 Policy provides:

> **Section IV. Exclusions**
> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured:
>
> . . .
>
> B. based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any Wrongful Act or Related Wrongful Act or any fact, circumstance or situation which has been the subject of any notice or Claim given under any other policy of which this Policy is a renewal or replacement.

(*Id.* (emphasis in original).) Navigators asserted Section IV.B barred coverage because the

underlying lawsuit was based on alleged wrongful acts that were the subject of a prior claim

reported by Vita to Navigators in 2007. (*Id.* ¶ 18.)

Navigators contended Vita previously reported a claim made by Vita shareholder

Michael N. Kreiger under the Directors and Officers Liability Insurance Policy issued to Vita for

the policy period of January 17, 2007 to January 17, 2008 (the "2007 Policy"). (*See* 2007 Policy,

Compl., Ex. F (Dkt. No. 1–6).) Kreiger, via his attorney, sent correspondence dated

April 24, 2007 to Vita's directors (the "Kreiger letter"), alleging that in April 2007 Vita reached

an agreement in principle to issue common stock and warrants to Bedford at "very favorable

prices and terms." (Compl. ¶ 18; *see also* Kreiger Letter, Compl. Ex. E (Dkt. No. 1–5).)

Specifically, the letter referenced Vita's Form 10-K for the fiscal year ending on

December 31, 2006, wherein Vita reported its agreement with Bedford, including:

***Possible Subsequent Event – Additional Equity Issuance***

> The Company has reached an agreement in principle, with Howard Bedford, a Company director, pursuant to which Mr. Bedford would invest $3,000,000 in the Company. Substantially all of these funds would be used for working capital requirements. In consideration for his investment, Mr. Bedford would receive 2,400,000 shares of Common Stock; two year warrants to purchase 500,000 shares of Common Stock at an exercise price of $1.25 per share; three-year warrants to purchase 500,000 shares of Common Stock at an exercise price of $1.50 per share; four-year warrants to purchase 500,000 shares of Common Stock at an exercise price of $1.50 per share; and five-year warrants to purchase 500,000 shares of Common Stock at an exercise price of $1.75 per share. The warrants would be exercisable immediately. Subsequent to this transaction, Mr. Bedford would own approximately 38.2% of the Company's outstanding common stock and warrants to acquire another 10.3%. On April 10, 2007, $1,000,000 has been invested.

(Counterclaim (Dkt. No. 17) ¶ 12 (emphasis in original).) The Kreiger letter advised Vita that "[g]iven the relationship of Mr. Bedford to the Company and what appears to be very favorable prices and terms, both my client and I believe that Vita's board of directors has violated its fiduciary duties to Mr. Kreiger and other Vita shareholders under both federal, state and common law." (Kreiger Letter at 1.) The letter urged Vita to make adjustments to the terms of the financing, requested that Vita provide documentation supporting the Bedford deal as the "proposal, as it currently stands, does not treat the shareholders fairly," and requested that Vita furnish "the requisite documentation supporting this proposed financing including board resolutions and fairness options, if any." (*Id.* at 2.)

Navigators claims it acknowledged receipt of the Kreiger letter as notice of circumstances that might give rise to a claim under the 2007 Policy. (Counterclaim ¶ 14.) Like the 2009 Policy, the 2007 policy is an indemnity policy, which provides in relevant part, "[t]he insurer shall pay on behalf of the Company all Loss which the Insured Persons shall be legally obligated to pay as a result of a Claim . . . first made against the Insured Persons during the Policy Period or the Discovery Period for a Wrongful Act, but only to the extent the Company is

required or permitted by law to indemnify the Insured Persons." (2007 Policy at Section I.B

("Insuring Agreements"); *see also* 2009 Policy (same).)

The parties point to different provisions of both policies in support of their respective

positions regarding whether Navigators must provide coverage and pay the costs of defending

the underlying lawsuit. Vita filed the instant complaint on August 19, 2016, seeking declaratory

relief. In Count I, Vita claims that it is entitled to coverage for the underlying lawsuit under

the 2009 Policy, and Navigators therefore has an obligation to pay all of Vita's costs of defense

of the underlying suit, together with interest. (Compl. ¶¶ 39–44.) In the alternative, Vita asserts

in Count II that Navigators must cover the costs of defending the underlying lawsuit pursuant to

the terms of the 2007 Policy. (*Id.* ¶¶ 45–46.) Vita also argues that Navigators is estopped from

raising any defenses to coverage under the policies because it improperly denied coverage and

refused to advance the costs of defending the underlying lawsuit. (*Id.* ¶¶ 23–26.)

Navigators filed an answer and counterclaim on January 17, 2017, attaching several

documents, including the Kreiger letter and related correspondence. (Dkt. No. 17.) Navigators'

counterclaim seeks a declaration that the 2009 Policy does not afford coverage because the

underlying lawsuit is not a claim first made during the 2009 policy period.

(Counterclaim ¶¶ 3, 40–48. Navigators also seeks a declaration that coverage is precluded under

both the 2007 and 2009 policies, because Section IV.H of both policies, as modified by

Endorsement Nos. 3, 4 and 20, bars coverage for any claim made against an insured by any

security holder, officer, or director. (*Id.* ¶¶ 4–5, 49–61.)

# ANALYSIS

## I.    MOTION FOR JUDGMENT ON THE PLEADINGS

Navigators' motion for judgment on the pleadings is brought pursuant to Federal Rule of Civil Procedure 12(c). Rule 12(c) provides that a party may seek judgment on the pleadings "[a]fter the pleadings have closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). When reviewing Rule 12(c) motions, we employ the same standards applicable to motions brought under Rule 12(b)(6). *Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016); *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007)). The complaint must state a claim that is plausible on its face. *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016) (citing *Vinson v. Vermilion Cnty., Ill.*, 776 F.3d 924, 928 (7th Cir. 2015)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). We accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *St. John*, 822 F.3d at 389.

The parties agree Illinois law governs their dispute. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." (internal citation and quotations omitted)). Accordingly, we apply the law that "the Supreme Court of Illinois would apply if the case were before that tribunal rather than before this court." *Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001). The construction of an insurance policy is a question of law. *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311,

856 N.E.2d 338, 342 (Ill. 2006); *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill. 2d 278, 292,

757 N.E.2d 481, 491 (Ill. 2001); *Crum & Forster Managers Corp. v. Resolution Trust Corp.*,

156 Ill. 2d 384, 391, 620 N.E.2d 1073, 1079 (Ill. 1993).  "When construing the language of an

insurance policy, a court's primary objective is to ascertain and give effect to the intentions of

the parties as expressed by the words of the policy."  *Cent. Ill. Light Co. v. Home Ins. Co.*,

213 Ill. 2d 141, 153, 821 N.E.2d 206, 213 (Ill. 2004).  An insurance policy is to be construed as a

whole, "giving effect to every provision, if possible, because it must be assumed that every

provision was intended to serve a purpose."  *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*,

223 Ill. 2d 352, 362, 860 N.E.2d 307, 314 (Ill. 2006) (citing *Cent. Ill. Light*, 213 Ill. 2d at 153,

821 N.E.2d at 213).  "If the words used in the policy are clear and unambiguous, they must be

given their plain, ordinary, and popular meaning."  *Cent. Ill. Light*, 213 Ill. 2d at 153,

821 N.E.2d at 213 (citing *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 102,

607 N.E.2d 1204, 1212 (Ill. 1992)); *Crum & Forster*, 156 Ill. 2d at 391, 620 N.E.2d at 1078.

"Although insurance policies are construed liberally in favor of coverage, this rule of

construction comes into play only when the policy language is ambiguous."  *Livorsi Marine*,

222 Ill. 2d at 311, 856 N.E.2d at 343; *accord. Swiderski Elecs.*, 233 Ill. 2d at 363,

860 N.E.2d at 314 ("[I]f the words used in the policy are ambiguous, they will be strictly

construed against the drafter.").

    **A.    Estoppel**

    Vita argues Navigators is estopped from raising any policy defenses because it did not

provide a defense required under the policy pursuant to a reservation of rights, nor did it seek a

declaratory judgment that no coverage exists.  (Resp. (Dkt. No. 27) at 2.)  Vita acknowledges

the 2009 Policy and the 2007 Policy do not "requir[e] a prototypical 'duty to defend,'" but

instead argues the policies placed a duty on Navigators to "advance the Costs of Defense prior to the final disposition of any Claim." (*Id.* at 3.) Vita contends that this duty to advance the costs of defense is analogous to the duty to defend, arguing that in both cases the insurer's duty is to provide some of the resources for the defense of the lawsuit "in order to enable the policyholder to battle the underlying claim without the additional burden of the cost of counsel for that suit." (*Id.*)

"The general rule of estoppel provides that an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150, 708 N.E.2d 1122, 1134 (Ill. 1999). "Rather, the insurer has two options: (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage." *Id.* at 150–51, 708 N.E.2d at 1134–35. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage. *Id.*; *accord. Title Indus. Assurance Co., R.R.G. v. First Am. Title Ins. Co.*, 853 F.3d 876, 883 (7th Cir. 2017) ("An insurer that fails to take either of these actions does so at its peril. If a court later finds that the insurer breached its duty to defend, the insurer will be estopped from asserting policy defenses to coverage."). "In deciding whether an insurer breached its duty, Illinois courts ordinarily apply the 'eight-corners' rule: 'the court compares the four corners of the underlying complaint with the four corners of the insurance policy to determine whether facts alleged in the underlying complaint fall within or potentially within coverage.'" *Title Indus. Assurance Co.*, 853 F.3d at 883 (quoting *Am. Alternative Ins. Corp. v. Metro Paramedic Servs., Inc.*, 829 F.3d 509, 513–14 (7th Cir. 2016)).

The "estoppel doctrine applies only where an insurer has breached its duty to defend." *Ehlco Liquidating Trust*, 186 Ill.2d at 151, 708 N.E.2d at 1135 (further explaining "[a]pplication of the estoppel doctrine is not appropriate if the insurer had no duty to defend. . . ."). "The insurer's duty to defend its insured arises from the undertaking to defend as stated in the contract of insurance." *Zurich Ins. Co. v. Raymark Indus., Inc.*, 118 Ill. 2d 23, 48, 514 N.E.2d 150, 161 (Ill. 1987). Under Section VII.B of both the 2009 Policy and the 2007 Policy, "[t]he Insureds, and not the insurer, have the duty to defend all Claims." (2009 Policy at VII.B; 2007 Policy (same).) Section VII.E of the policies provides the "Insurer shall advance Costs of Defense prior to the final disposition of any Claim, provided such Claim is covered by this Policy." (*Id.* at Section VII.E.)

There is no dispute that Section VII.B expressly disclaims Navigators' duty to defend. Notwithstanding this unambiguous language, Vita argues that Navigators' duty to advance the costs of defense under Section VII.E is analogous to a duty to defend, and therefore, the estoppel doctrine applies. (Resp. at 3.) It is not clear that a "duty to defend" and a "duty to advance defense costs" are interchangeable. *Compare Seeger v. Gulf Underwriters Ins. Co.*, No. 04 C 7176, 2005 WL 6772545, at *2 (N.D. Ill. Mar. 17, 2005) (refusing to apply "duty to defend" case law where although the policy provided for a permissive duty to advance defense costs, the policy also, as here, explicitly disclaimed the insurer's duty to defend), *with Welch v. Agric. Excess & Surplus Ins. Co.*, No. 00 C 5725, 2001 WL 1155249, at *4–5 (N.D. Ill. Sept. 28, 2001) (finding "duty to defend" principles served as persuasive authority where the policy was silent as to the insurer's duty to defend, but provided the insurer "shall

advance Costs of Defense").[1]  Vita's position that policy language establishing a duty to advance defense costs for covered claims equates to a duty to defend is contrary to the plain language of the contract when read as a whole.  The policies unambiguously state the "Insureds, and not the Insurer, have the duty to defend all Claims."  (2009 Policy, Section VII.B; 2007 Policy (same).) At the same time, the policies establish Navigators' obligation to advance the costs of defense for covered claims.  (*Id.* at  Section VII.E.)  The two provisions are not mutually exclusive. Accordingly, because the policies do not "include[] a duty to defend," Navigators is not estopped from refusing to defend or raising defenses to Vita's demand for defense costs.  *Ehlco Liquidating Trust*, 186 Ill. 2d at 150, 708 N.E.2d at 1134.

### B.      Policy Defenses

Navigators raises several defenses in support of its position that the policies do not cover Vita's claim for coverage of the underlying lawsuit.  First, Navigators contends that the underlying lawsuit is not a claim first made during the 2009 policy period, and therefore, Vita has no cause of action under the 2009 Policy.  (Mot. at 10–12.)  Similarly, Navigators asserts that the 2009 Policy's "prior notice" exclusion bars coverage for the underlying lawsuit.  (*Id.* at 12.) Finally, Navigators contends that Vita's claim for coverage of the underlying lawsuit is not actionable under either policy because the "Security Holder/Insured v. Insured Exclusion" precludes claims against an insured by the company's security holders, directors, or officers. (*Id.* at 12–15.)

---

[1] Navigators contends we should follow *Seeger* and conclude it had no duty to defend or advance costs here.  (Reply Br. at 3.)  However, the policy in *Seeger* vested the defendant-insurer with the discretion to decide whether to advance defense costs, unlike here, where the policy states the "Insurer *shall* advance Costs of Defense" for covered claims.  (2009 Policy at Section VII.E (emphasis added).)

1.     Coverage Under the 2009 Policy

Navigators first argues the underlying lawsuit arose out of and involves the same

wrongful acts alleged in the Kreiger letter, and is therefore only covered under the 2007 Policy,

if at all.  (Mot. at 10.)  Under the 2007 Policy's "relation back" provision, when an insured "first

becomes aware of a specific Wrongful Act" and gives notice to the insurer, then any subsequent

claim arising out of the same wrongful act "shall be deemed to have been made at the time the

Insurer received such written notice from the Insured."  (2007 Policy at Section VIII.B.)

Navigators argues the underlying lawsuit—containing the same factual predicate as the Kreiger

letter—was "deemed to have been made" at the time Navigators received written notice of the

Kreiger letter during the 2007 Policy period.  (Mot. at 10; Reply at 5.)  As such, Navigators

argues coverage of the underlying lawsuit is barred under the 2009 Policy's "prior notice"

exclusion, which states the insurer

> shall not be liable to make any payment for Loss in connection with any Claim
> made against any Insured . . . based upon, arising out of, relating to, directly or
> indirectly resulting from or in consequence of, or in any way involving any
> Wrongful Act or Related Wrongful Act or any fact, circumstance or situation which
> has been the subject of any notice or Claim given under any other policy of which
> this Policy is a renewal or a replacement.

(2009 Policy at Section IV.B.)

First, Vita states in a footnote that the Kreiger letter is not a "claim" as that term is

defined in the policies.[2]  (Resp. at 6, n.2.)  Rather, Vita contends the Kreiger letter only

constituted "notice of circumstance that might give rise to a claim" under the 2007 Policy.  (*Id.*)

---

[2] Vita's brief footnote argument risks waiver, but we find it minimally well-developed enough to
address it herein.  *See Harmon v. Gordon,* 712 F.3d 1044, 1053 (7th Cir. 2013) (citations
omitted) ("We have often said that a party can waive an argument by presenting it only in an
undeveloped footnote."); *Hernandez v. Cook Cnty. Sheriff's Office,* 634 F.3d 906, 913
(7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be
properly treated as waived.").

Vita tendered the Kreiger letter to Navigators on April 25, 2007, stating "[a]ttached please find a potential notice of loss in regards to the captioned account for your file and review." (Answer, Ex. B (Dkt. No. 17–2) at PageID#: 439; *see also id.* at PageID#: 440 (attaching the Kreiger letter and stating "[p]lease review and forward to the carrier as a notice of potential claim").) Indeed, according to Navigators' response letter, Navigators acknowledged the Kreiger letter as "notice of circumstances that might subsequently give rise to a Claim," and instructed Vita to advise if "an actual Claim, as defined in the Policy, has been made, or if this matter subsequently develops into a Claim . . . so that a coverage analysis may be made at that time." (Answer, Ex. C (Dkt. No. 17–3) (further instructing Vita to "advise us immediately if an actual Claim is made").) Notwithstanding the parties' contemporaneous correspondence that may support a finding that they did not intend to treat the Kreiger letter as a claim under the policy, we are bound to apply the unambiguous contract language. *Cent. Ill. Light*, 213 Ill. 2d at 162–63, 821 N.E.2d at 213–14 (explaining that words must be given their "plain, ordinary, and popular meaning" if they are clear and unambiguous, and cautioning that a "contract is not rendered ambiguous merely because the parties disagree on its meaning"). The policies define a "claim" as including a "written demand for monetary or non-monetary relief made against any Insured and reported to the Insurer pursuant to Section VIII.A(1)." (2007 Policy at Section III.A(1).) The Kreiger letter conveyed the belief that Vita's Board of Directors had violated its fiduciary obligations to its shareholders, demanded non-monetary relief from Vita in the form of documentation supporting Vita's proposed financing to Bedford, and was reported to Navigators during the 2007 Policy period. (*See* Kreiger Letter at 1–2.) The Kreiger letter therefore constituted a "claim" under the unambiguous terms of the 2007 Policy.

Having determined the Kreiger letter was a claim made under the 2007 Policy, we next consider whether the underlying lawsuit arose out of the same "Wrongful Act or Related Wrongful Act," thus barring coverage of the lawsuit under the 2009 Policy. The policies define a "Wrongful Act" as including "any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty . . . by any Insured Persons in their capacity with the Company." (2009 Policy at Section III.R; 2007 Policy (same).) Likewise, a "Related Wrongful Act" is defined broadly as any "Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event, or decision." (*Id.* at Section III.O.)

Both the underlying lawsuit and the Kreiger letter allege Vita's Board of Directors breached its fiduciary duties to shareholders by accepting Bedford's offer to invest $3,000,000 in Vita in exchange for more than 2,400,000 shares of Vita at below market prices. (Underlying Compl. ¶¶ 40–43; Kreiger Letter at 2.) The underlying complaint relied on the transaction raised in the Kreiger letter as evidence of Bedford's allegedly fraudulent scheme to seize Vita's business and assets. (Underlying Compl. ¶¶ 1, 33–34, 40–43.) The underlying complaint alleged that "[k]nowing VITA's vulnerability and need for immediate cash infusion, Bedford also proceeded with his plan to seize the business and assets of VITA for wholly inadequate consideration by offering to make an additional investment in VITA," namely, Bedford volunteered the $3,000,000 investment in exchange for "an irrevocable proxy to vote all of Rubin's VITA stock plus receive an option to purchase 2,650,000 additional shares of VITA at a price starting at $1.25 per share and increasing to $1.75 per share." (*Id.* ¶ 41.) It further alleged that "[b]ased on acceptance of [Bedford's] demands," Vita agreed to the transaction, "allowing him effectively to control VITA." (*Id.* ¶ 43; *see also id.* ¶ 34 (alleging one of the "integral

13

ingredients" of Bedford's scheme included "taking effective control of VITA through an additional contribution to its capital").)

The underlying lawsuit unquestionably arose out of the same circumstances giving rise to the concerns first raised in the Kreiger letter. Thus, the Kreiger letter and the underlying lawsuit involve the "same Wrongful Act or Related Wrongful Act" and constitute a claim made under the 2007 Policy. Under Section VIII.B, Vita's claim for coverage of the underlying lawsuit is "deemed to have been made" during the 2007 Policy period and is not covered by the 2009 Policy. Likewise, Section IV.B of the 2009 Policy excludes the underlying lawsuit from coverage for the same reasons. Consequently, we grant Navigators' motion for judgment on the pleadings with respect to Vita's claim for coverage under the 2009 Policy, and we dismiss Count I of Vita's complaint.

### 2. Security Holder/Insured v. Insured Exclusion

Navigators also contends that both the 2009 Policy and the 2007 Policy exclude from coverage claims asserted against an insured brought by a security holder or a director of the company, and these exclusions bar coverage of the underlying lawsuit in its entirety.[3] (Mot. at 12.) The so-called insured versus insured exclusion set forth in Section IV.H states Navigators "shall not be liable to make any payment for Loss in connection with any Claim made against any Insured . . . by or on behalf of the Company, or any security holder of the Company, or any Directors or Officers." (2007 Policy at Section IV.H.) The provision contains an exception, which provides, "however, this exclusion shall not apply to: . . . any Claim brought by any security holder of the Company whether directly or derivatively, if the security holder

---

[3] As we have already determined the underlying lawsuit is excluded from coverage under the 2009 Policy, we consider Navigators' motion with respect to the 2007 Policy only, though the relevant policy language is the same.

bringing such Claim is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any Director or Officer or the Company."

(*Id.* at Section IV.H(3) (the "security holder exception").)

Insured versus insured exclusions are "standard" in insurance policies such as the one at issue here. *Miller v. St. Paul Mercury Ins. Co.*, 683 F.3d 871, 874 (7th Cir. 2012), *order clarified* (Aug. 3, 2012) (citing *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 168 F.3d 956, 957–58 (7th Cir. 1999)). The Seventh Circuit has explained such exclusions are designed to

> exclude from coverage losses for claims brought by one "insured" against another "insured," often defined to include current and former corporate directors and officers as well as the corporation itself. The exclusion serves to limit moral hazard. Without such an exclusion, a [Directors and Officers liability insurance] policy could require the insurer to pay for the business mistakes of insured directors and officers if the corporation (also an insured) or if former officers or directors brought suit, collusive or otherwise, against them. Complications arise, however, when insured defendants are sued by a group of plaintiffs where some are insured and some are not. . . .

*Id.* at 872; *see also Amerisure Ins. Co. v. Nat'l Sur. Corp.*, 695 F.3d 632, 635 (7th Cir. 2012) (explaining that without such an exclusion, "parties insured under the same policy would have no disincentive to sue one another, since only the insurance company would ultimately bear the cost of the judgment. This sets up what is known to economists as a moral hazard, because the party taking the risk will not bear the costs of its behavior. The Exclusion counteracts that problem by eliminating the possibility of a third party's subsidization of such a lawsuit."); *Level 3 Commc'ns*, 168 F.3d at 958 (an insured versus insured exclusion prevents collusion, "such as suits in which a corporation sues its officers and directors in an effort to recoup the consequences of their business mistakes . . . , thus turning liability insurance into business-loss insurance").

The underlying lawsuit was filed by 24 former Vita shareholders who owned more than 30 percent of the issued and outstanding shares of Vita. (Underlying Compl. ¶¶ 5, 8.) Two

of the plaintiffs, Stephen Rubin and John Seramur, were also Vita directors. (Mot. at 2.) The defendants in the underlying lawsuit included Bedford and other members of the Vita Board of Directors. (Underlying Compl. ¶ 6.) Thus, Navigators argues that because at least some of the plaintiffs in the underlying lawsuit qualify as "security holders" or directors, the entire claim is barred under the insured versus insured exclusion. (*Id.* at 14–15.) Navigators further argues the security holder exception in Section IV.H(3) does not save the claim because Rubin and Seramur, as Vita directors, actively participated and assisted in the underlying litigation, and the "majority of the allegations in the Underlying Lawsuit concern Bedford's manipulation of Rubin; Bedford's removal of Rubin as Chairman of Vita's Board of Directors; Rubin's exclusion from the Special Committee; and both Rubin's and Seramur's insistence that their Vita shares should not be voted in favor of Bedford's fraudulent merger scheme." (*Id.* (citing Underlying Compl. ¶¶ 39, 49, 52, 60, 112–13).)

Vita does not dispute that Rubin and Seramur fall within the definition of "Director" under the 2007 Policy, and therefore are subject to the insured versus insured exclusion.[4] (*See* 2007 Policy at Section III.D (defining "Directors" as "all persons who were, now are, or shall be directors" of Vita).) However, Vita argues that the lawsuit was also brought by 22 other former shareholders who should not be considered "security holders" under the plain language of the policy, and who are therefore not subject to the insured versus insured exclusion. (Resp. at 9–10.) Vita contends Navigators was required to advance defense costs with respect to the claims of these former shareholders on an allocated basis. (*Id.* at 10–11.) Thus, the parties dispute whether the underlying plaintiff-shareholders qualify as "security holders" under

---

[4] Vita disputed whether the claims made by Seramur fall within the 2009 Policy's insured versus insured exclusion or whether they instead are subject to an exception for claims made by directors more than two years after they leave office. (Resp. at 9, n.3.) For the reasons stated above, the 2009 Policy does not apply, so the dispute is immaterial.

the 2007 Policy and if so, whether their presence contaminates the entire underlying lawsuit or whether Vita is still entitled to allocated coverage under the policy.

a)    <em>Allocation</em>

The presence of both covered and non-covered plaintiffs in the underlying lawsuit "does not automatically bar coverage for the entire suit nor automatically allow coverage for all claims." *Strategic Capital Bancorp Inc. v. St. Paul Mercury Ins. Co.*, 723 F. Supp. 2d 1053, 1059 (C.D. Ill. 2010). Rather, "[w]hat is well established is that if there is an Insured making a claim against another Insured and the insurance policy has an unambiguous Insured vs. Insured exclusion clause, the claims brought by the Insured will not be covered." *Id.* (citing *Level 3 Commc'ns*, 168 F.3d at 956; *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 412 F.3d 1224, 1230 (11th Cir. 2005)). The Navigators policies contain an allocation clause, which states that if "a Claim made against any Insured includes both covered and uncovered matters, or is made against any Insured and others, the Insured and the Insurer recognize that there must be an allocation between insured and uninsured Loss." (2007 Policy at Section VII.D.)

The policy's allocation provision is materially the same as the allocation clauses given effect in other cases. *See Miller*, 683 F.3d at 873 (considering allocation clause stating "[i]f on account of any Claim . . . the Insureds incur an amount consisting of both Loss covered by this Policy and loss not covered by this Policy because the Claim includes both covered and uncovered matters, such amount shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters"); *Level 3 Commc'ns*, 168 F.3d at 960 (requiring allocation of covered and uncovered losses where the policy provided that if "a Claim against the Insured Persons includes both covered and

17

uncovered matters, . . . the Insureds and the [Insurance] Company shall use their best efforts to agree upon a fair and proper allocation of such amount between covered Loss and uncovered loss"). Accordingly, we "apply the allocation clause of the [Directors and Officers] policy to provide indemnity for losses on claims by non-insured plaintiffs but not for losses on claims by insured plaintiffs." *Miller*, 683 F.3d at 875. This result "minimizes the risk of arbitrary results and discourages efforts to manipulate the result by the ways in which individual claims happen to be combined or separated," and has the "advantage of conforming to the parties' reasonable expectations: the insurer owes no duty to indemnify for claims brought by insured plaintiffs but does owe that duty for claims brought by others." *Id.*

Navigators nevertheless contends that the security holder exception language makes this case materially different from *Miller* and *Level 3 Communications*. We are unconvinced by the cases Navigators cites in support of its argument and urges us to follow. For example, in *Sphinx*, while the security holder exception language—excluding claims by security holders unless they are acting "totally independent of" and without the "active participation of" any director—is the same here, *Sphinx* did not involve an allocation clause, and the court based its decision on the fact that the policy language unambiguously did not require segregation of claims based on the percentage attributable to each litigant. 412 F.3d at 1230–31. Navigators ignores the presence of the allocation provision, which is "a dispositive factor," and for this reason, its reliance on *AMERCO v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 13 C 2588, 2014 WL 2094198 (D. Ariz. May 20, 2014) is also mistaken. *See id.* at * 7 (observing "other courts have found the presence of an allocation [clause] to be a dispositive factor" and declining to find that allocation is "appropriate" even in the absence of an allocation provision in the policy); *see also Home Fed. Sav. & Loan Ass'n of Niles v. Fed. Ins. Co.*, No. 06 C 3053, 2007 WL 2713060, at *5

(N.D. Ohio Sept. 14, 2007) ("This Court finds that when interpreted under their plain meaning and especially after considering the allocation provision, the policy covers the non-insured plaintiffs' claims."); *Megavail v. Ill. Union Ins. Co.*, No. 05 C 1374, 2006 WL 2045862, at *3 (D. Or. July 19, 2006) ("[I]f the exclusionary clause is applicable, the allocation clause establishes the method for addressing claims involving both insured and uninsured plaintiffs. . . . [A]s contemplated by the *Level 3* court, even the presence of an insured who is the primary plaintiff does not excuse an insurance company's duty to defend."); *Fed. Ins. Co. v. Infoglide Corp.*, No. 05 C 189, 2006 WL 2050694, at *5 (W.D. Tex. July 18, 2006) ("[T]he decisive fact in *Level 3* was the existence of an allocation clause that clearly contemplated cases in which covered claims could be combined with non-covered claims, and the absence of that sort of clause was one of the reasons why *Sphinx* came out differently than *Level 3*.").[5] We accordingly apply the allocation clause to Vita's claim for coverage of the underlying lawsuit under the 2007 Policy. *See Miller*, 683 F.3d at 875; *Level 3 Commc'ns*, 168 F.3d at 960.

---

[5] Navigators cites other cases that are likewise distinguishable. *See Bernstein v. Genesis Ins. Co.*, 90 F. Supp. 2d 932, 933 (N.D. Ill. 2000) (indicating only in dicta that an insured versus insured clause may bar coverage in its entirety if just one plaintiff was covered by the exception, but not actually addressing the issue as the case did not involve covered and uncovered claims); *Jerry's Enterprises, Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 890 (8th Cir. 2017) (considering a policy that defined a "claim" as a "civil proceeding commenced by service of a complaint," which unlike here, unambiguously barred the entirety of the underlying lawsuit); *PowerSports, Inc. v. Royal & Sunalliance Ins. Co.*, 307 F. Supp. 2d 1355, 1362 (S.D. Fla. 2004), *aff'd sub nom. Powersports, Inc. v. Royal Sunalliance Ins. Co.*, 128 F. App'x 95 (11th Cir. 2005) (addressing an insured versus insured exclusion where all of the plaintiffs in the underlying action were insured persons and explaining "[a]llocation clauses only become relevant in the event that a loss involves both covered and uncovered claims," and since the case involved "uncovered claims only, the allocation question is moot").

b)      *Security Holder*

While it is undisputed that the claims of Rubin and Seramur are excluded under

Section IV.H to the extent they were acting as directors of the company, questions remain as to

whether the other shareholder-plaintiffs in the underlying lawsuit qualify as "security holders"

and also fall under the exclusion.  The term "security holder of the Company" as used in

Section IV.H is not a defined term.  Vita argues that it can "only be interpreted to include parties

who were shareholders of Vita at the time the relevant complaint was brought," and since all of

the underlying plaintiffs were former shareholders by that time, none qualify as "security

holders."  (*Id.* at 10.)  Vita concludes that Navigators was therefore required to advance defense

costs with respect to the claims of each of the 22 former shareholders on an allocated basis.

(*Id.* at 11.)

Generally, a "claims made" policy covers the insured for claims made during the policy

period, irrespective of when those claims arose.  *Sphinx*, 412 F.3d at 1226; *Bernstein*,

90 F. Supp. 2d at 937 (explaining coverage under a claims made policy "is determined based on

when the claim was filed, not when the underlying actions leading to the claim occurred").

Navigators argues that application of the relation back provision of Section VIII.B requires the

status of the underlying plaintiff-shareholders to be assessed at the time of the Kreiger Letter.

(Reply at 10–11.)  We agree.  As set forth above, if Navigators must provide coverage for the

underlying lawsuit, that duty arises out of the claim made in the Kreiger Letter under the

2007 Policy.

However, based on the record before us, whether the plaintiff-shareholders were current

or former shareholders at the time of the Kreiger letter is unclear.  If any were present

shareholders at that time, they will be considered "security holders" under the 2007 Policy, and

are excluded from coverage under Section IV.H.  *See Bernstein*, 90 F. Supp. 2d at 938 (concluding, based on similar policy language, that the "plain and unambiguous meaning of 'security holder' is *present* security holder" (emphasis in original)).  Accordingly, we deny Navigators' motion with respect to Vita's claim for coverage under the 2007 Policy.  To the extent that any of the underlying plaintiff-shareholders did not qualify as "security holders" at the time the Kreiger letter claim was made, they may be entitled to coverage under the 2007 Policy on an allocated basis.

## II. VITA'S MOTION TO STRIKE

As at least some of Vita's claims remain, we consider its motion to strike all of Navigators' affirmative defenses.  (Mot. to Strike (Dkt. No. 19).)  Vita's motion is governed by Federal Rule of Civil Procedure 12(f), which states that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Motions to strike are generally disfavored because they "potentially serve only to delay," and so affirmative defenses "will be stricken only when they are insufficient on the face of the pleadings."  *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).  To survive a motion to strike, an affirmative defense must satisfy a three-part test:  "(1) the matter must be properly pleaded as an affirmative defense; (2) the matter must be adequately pleaded under the requirements of Federal Rules of Civil Procedure 8 and 9, and (3) the matter must withstand a Rule 12(b)(6) challenge."  *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1039 (N.D. Ill. 2014) (citation omitted).  We follow the majority view of district court decisions in this circuit, which apply the pleading standard set forth in *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) to affirmative defenses.  *See Edwards v. Mack Trucks, Inc.*,

310 F.R.D. 382, 386 (N.D. Ill. 2015) ("aligning with the majority of courts in this district" in applying the *Twombly-Iqbal* standard); *Sarkis' Cafe*, 55 F. Supp. 2d at 1040; *Shield Tech. Corp. v. Paradigm Positioning, LLC*, No. 11 C 6183, 2012 WL 4120440, at *8 (N.D. Ill. Sept. 19, 2012) ("[W]e believe that the test applicable to affirmative defenses should reflect current pleading standards, and therefore adopt the majority view that *Twombly* and *Iqbal* apply to affirmative defenses."); *Riemer v. Chase Bank USA, N.A.*, 274 F.R.D 637, 639–40 (N.D. Ill. 2011) (collecting cases).

Navigators asserts 11 affirmative defenses in its answer. Vita argues that some of Navigators' affirmative defenses are "nothing but boilerplate and the remaining defenses fail to plausibly assert any affirmative defense." (Mot. to Strike at 1–2.) In response, Navigators agreed to withdraw its Second and Fourth Affirmative Defenses, without prejudice. *See, e.g.*, *Palomares v. Second Fed. Sav. & Loan Ass'n of Chi.*, No. 10 C 6124, 2011 WL 2111978, at *2 (N.D. Ill. May 25, 2011) (even where a motion to strike is granted, leave to amend the pleading is to be freely granted as justice requires under Rule 15(a), and a party is not necessarily precluded from asserting the substantive merits of an affirmative defense later in the case). We therefore grant Vita's motion with respect to the Second and Fourth Affirmative Defenses and address the remaining disputed defenses below.

A. **First Affirmative Defense**

Navigators' First Affirmative Defense alleges only "[t]he Complaint fails to state a claim upon which relief can be granted." (Answer at 16.) Navigators contends this bare bones defense is sufficient because it is supported by the facts stated in its answer and counterclaim, which it contends are sufficient to place Vita on notice as to Navigators' position that there is no coverage for the underlying lawsuit. (Resp. to Mot. to Strike (Dkt. No. 21) at 3.) In the alternative,

Navigators requests leave to amend the answer to "reiterate the numerous facts pled in its Counterclaim" that support the defense. (*Id.*)

Although there is disagreement as to whether failure to state a claim can be properly asserted as an affirmative defense, "[e]ven assuming that failure to state a claim is an appropriate defense, Defendants must still adequately plead the defense in accordance with Rule 8, providing notice as to how and in what portion of the complaint Plaintiff has failed to state a claim upon which relief may be granted." *Mack Trucks*, 310 F.R.D. at 387; *accord. Sarkis' Cafe*, 55 F. Supp. 3d at 1034. While affirmative defenses "rarely will be as detailed as a complaint (or a counterclaim)," a party must do more than assert "boilerplate defenses as mere placeholders without any apparent factual basis." *Mack Trucks*, 310 F.R.D. at 386. Navigators' one-sentence defense is insufficient to survive a motion to dismiss, and it is accordingly stricken without prejudice. *Id.* at 387; *see also Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00 C 6703, 2001 WL 322005, at *3 (N.D. Ill. Apr. 2, 2001) ("The defense identifies the legal theory without indicating how it is connected to the present case. While the Federal Rules of Civil Procedure allow liberal pleadings, they do not allow a claimant to merely recite the standard for a motion to dismiss under Rule 12(b)(6)."). Navigators is granted leave to amend its First Affirmative Defense on or before July 5, 2017.

### B.     Third Affirmative Defense

Navigators' Third Affirmative Defense asserts that "[t]o the extent Vita has any covered Loss, such Loss must be reduced for Vita's failure to mitigate its damages." (Answer at 16.) Although the allegation is bare of factual specificity, "where discovery has barely begun, the failure to mitigate defense is sufficiently pled without additional facts." *Thomas v. Exxon Mobil Corp.*, No. 7 C 7131, 2009 WL 377334, at *4 (N.D. Ill. Feb. 11, 2009) (internal quotation marks

omitted) (quoting *AAR Int'l, Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 800 (N.D. Ill. 2002)). Threadbare pleading of a mitigation defense is permitted because defendants are usually unable to learn the factual specifics of the plaintiff's mitigation efforts without discovery. *Id.* at *2. Navigators' Third Affirmative Defense sufficiently puts Vita on notice that its mitigation efforts will be an issue in this case. *Id.* We therefore deny Vita's motion to strike Navigators' Third Affirmative Defense.

### C.      Fifth Through Eleventh Affirmative Defenses

Navigators' Fifth through Eleventh Affirmative Defenses set forth substantive reasons why Vita is not entitled to coverage for the underlying lawsuit. (Answer at 16–19.) Vita argues these defenses should be stricken because they "do nothing more than deny the allegations of Vita's complaint." (Reply to Mot. to Strike (Dkt. No. 26) at 3.) Where an affirmative defense merely denies the allegations in the complaint, it is inappropriately pleaded as an affirmative defense. *Mack Trucks*, 310 F.R.D. at 386 ("[A]ffirmative defenses must introduce a new matter or allegation that could serve as the basis for a defense and cannot be merely a denial of the Plaintiff's allegations"); *Thomas*, 2009 WL 377334, at *2 (granting a motion to strike affirmative defenses that were "nothing more than a mere denial of the allegations in the complaint"); *Holzer v. Prudential Equity Group LLC*, 520 F. Supp. 2d 922, 929 (N.D. Ill. 2007) ("It is improper to assert something as an affirmative defense that is nothing more than a denial of an allegation contained in the complaint." (citation omitted)). Navigators' affirmative defenses do more than simply deny the allegations in the complaint, instead relying on policy provisions that Navigators contends entitle it to relief notwithstanding Vita's allegations. Likewise, Navigators sets forth the basis for the defenses in sufficient detail such that it has plausibly stated a claim.

Accordingly, Vita's motion to strike Navigators' Fifth through Eleventh Affirmative Defenses is denied.

## CONCLUSION

For the foregoing reasons, we grant in part and deny in part Navigators' motion for judgment on the pleadings pursuant to Rule 12(c). (Dkt. No. 22.) The motion is granted with respect to Vita's claim for coverage under the 2009 Policy, and Count I of the complaint is accordingly dismissed. The motion is denied as to Vita's claims under the 2007 Policy as set forth in Count II. In addition, Vita's motion to strike Navigators' affirmative defenses is granted in part and denied in part. (Dkt. No. 19.) The motion is granted as to Navigators First, Second, and Fourth Affirmative Defenses, which are hereby stricken, without prejudice. Navigators is granted leave to file an amended answer on or before July 5, 2017. We deny Vita's motion to strike Navigators' Third, Seventh, Eighth, Ninth, Tenth, and Eleventh Affirmative Defenses. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: June 2, 2017
   Chicago, Illinois